IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:15–CV–00169–BR

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| WEAVER COOKE CONSTRUCTION, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on three cross–motions for summary judgment: plaintiff

Westfield Insurance Company ("Westfield") and defendant Zurich American Insurance

Company's ("Zurich") motion (DE # 67); defendant Selective Insurance Company of America's

("Selective") motion (DE # 72); and defendant Weaver Cooke Construction, LLC's ("Weaver

Cooke") motion (DE # 74). The parties have filed responses in opposition and replies. (DE ##

84, 86, 88, 90, 91, 94, 97–100.) The matter is now ripe for adjudication.

## I.      BACKGROUND

In 2006, New Bern Riverfront Development, LLC ("New Bern"), as the developer, and Weaver Cooke, as the general contractor, entered into a contract for construction of a condominium complex in New Bern, North Carolina. Weaver Cooke, in turn, entered into subcontracts with others for performance of work required to construct the project. In 2009, New Bern filed suit against Weaver Cooke and others based on allegedly defective construction of the project. New Bern declared bankruptcy, and the case--the Underlying Action--eventually ended up in the bankruptcy court for this district, where it remains pending.

With the exception of Weaver Cooke, the parties involved in the instant action are insurers of parties involved in the Underlying Action. Specifically, Westfield and Zurich issued to Weaver Cooke, as a named insured, commercial general liability policies. Selective issued to William H. Dale d/b/a DD Plumbing Company ("DD Plumbing"), a subcontractor of Weaver Cooke, as a named insured, commercial general liability policies. [Defendant Penn National Insurance Company ("Penn National")] issued to East Carolina Masonry, Inc., [("ECM")], a subcontractor of Weaver Cooke, as a named insured, commercial general liability

policies. Westfield and Zurich have been contributing to the costs of Weaver Cooke's defense of the Underlying Action pursuant to a reservation of rights.

(3/1/17 Order, DE # 55, at 1–2.)

Weaver Cooke entered into a subcontract with DD Plumbing on 4 October 2006, (see DD Plumbing Subcontract (DE # 71–22) Ex. 19 at 2), and a subcontract with ECM on 25 September 2006, (see ECM Subcontract (DE # 71–21) Ex. 18 at 2) [hereinafter "Subcontracts"]. Both Subcontracts require that the

> Contractor [Weaver Cooke], its members, managers, officers, directors, agents and employees [] be named as additional insureds on all insurance policies required by this Subcontract with regard to claims and liabilities for. . . property damage arising out of or resulting from (i) Subcontractor's activities under this Subcontract and for which Subcontractor may be legally liable. . . (ii) products and completed operations under this Subcontract. . . . "

(Id. at 13; DD Plumbing Subcontract (DE # 71–22) Ex. 18 at 12.) Both Subcontracts required additional insured coverage "on a primary and non–contributing basis." (DD Plumbing Subcontract (DE # 71–22) Ex. 19 at 3; ECM Subcontract (DE # 71–21) Ex. 18 at 3.)

Following the filing of the Underlying Action by New Bern, on 14 March 2012 Weaver Cooke sent two letters, identical in substance, to DD Plumbing and ECM (the "First Tender Letter") tendering its defense of the Underlying Action and requesting that the letter be forwarded to the recipient's agent and/or insurance carrier. (Weaver Cooke Tender Letters (DE # 71–31) Ex. 28 at 2, 5.) On 12 September 2013, Westfield sent two subsequent identical letters to Selective and Penn National (the "Second Tender Letter") tendering the defense in the Underlying Action. (Selective App'x (DE # 80–4) at 1; Penn National Req. for Admis. and Am. Answers (DE # 71–23) Ex. 20 at 85.) Pursuant to the commercial liability policies, Selective and Penn National have defended DD Plumbing and ECM, respectively, in the Underlying Action under a reservation of rights. (Selective App'x (DE # 78–2) Ex. 1.1 at 15; Penn National Resp.

Opp'n (DE # 84) at 2.)  To date, neither Selective nor Penn National has defended Weaver Cooke as an additional insured.

> In this action, Westfield, as the plaintiff, seeks a judgment declaring that its subject policy affords Weaver Cooke no coverage for the claims asserted in the Underlying Action; it has no further duty to defend Weaver Cooke against the claims asserted in the Underlying Action; and, Selective and/or Penn National have the duty to defend Weaver Cooke in the Underlying Action as an additional insured under their policies on a primary and non–contributory basis or, alternatively, on a contributory basis in equal shares with other insurers.  It also asserts a claim for equitable subrogation/contribution against Selective and Penn National for defense costs and expenses it has incurred in the Underlying Action or, alternatively, for those costs and expenses it has incurred in the Underlying Action beyond its pro–rata share.  Zurich has filed cross–claims against Weaver Cooke and the other insurer–defendants alleging declaratory judgment and equitable subrogation/contribution claims similar to those Westfield alleges.
> Weaver Cooke asserts a counterclaim and cross–claims against Westfield and Zurich, respectively, for a declaration that each owes Weaver Cooke a defense and indemnity to the claims in the Underlying Action.  It also asserts cross-claims against Selective and Penn National.  It alleges that it is an insured or additional insured under their respective policies and that those insurers engaged in prohibited claim settlement practices.  Weaver Cooke seeks declaratory and monetary relief.

(3/1/17 Order, DE # 55, at 2–3.)

On 1 March 2017, the court stayed this action on "[t]he issue of the insurers' duty to indemnify[,]" while "the issues of the insurer's duty to defend Weaver Cooke (including coverage as an additional insured) and Selective's and Penn National's handling of Weaver Cooke's claim" were allowed to proceed.  (Id. at 6.)  Following discovery on these issues, the parties filed the instant motions for summary judgment.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the record as a whole reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

### III. DISCUSSION

The parties' primary dispute is whether Selective and Penn National owe a duty to defend to Weaver Cooke in the Underlying Action as an additional insured provision under the policies issued to DD Plumbing and ECM. The parties also dispute whether Selective and Penn National violated the North Carolina Insurance Unfair Trade Practices Act ("IUTPA"), N.C. Gen. Stat. § 58–63–15, and the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75–1 et. seq.

### A. Standing

In response to Westfield and Zurich's motion for summary judgment, Selective contends that Westfield and Zurich "lack standing to assert additional insured rights under its insured's

subcontract[]" because they are not third–party beneficiaries of either the construction contract or

the DD Plumbing subcontract. (Selective Resp. Opp'n (DE # 91) at 9–10.)

> In order to maintain an action in federal court, a plaintiff must show that they have standing under federal law. <u>Miller v. Augusta Mut. Ins. Co.</u>, 157 [F. App'x] 632, 636 (4th Cir. 2005) (citing <u>Phillips Petrol. Co. v. Shutts</u>, 472 U.S. 797, 804[] (1985)). Under 28 [U.S.C.] § 2201, "[i]n a case of actual controversy within its jurisdiction. . . any court of the United States. . . may declare the rights and other legal relations of any interested party seeking such declaration." In order to determine if an actual controversy exists between interested parties, courts should consider "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Md. Cas. Co. v. Pac. Coal & Oil Co.</u>, 312 U.S. 270, 273[] (1941). If a plaintiff's complaint fails to allege facts sufficient to establish standing, the suit must be dismissed. <u>See, e.g.</u>, <u>Walker v. S.W.I.F.T. SCRL</u>, 517 F.Supp.2d 801, 808–09 (E.D. Va. 2007).

<u>Steadfast Ins. Co. v. Berkley Nat'l Ins. Co.</u>, 217 F. Supp. 3d 904, 910–11 (S.D.W. Va. 2016).

Westfield and Zurich claim that—as a direct result of Selective's and Penn National's

decision not to defend Weaver Cooke in the Underlying Action—Westfield and Zurich have

incurred substantial "fees, cost and expenses" in their defense of Weaver Cooke. (Westfield

Compl. (DE # 1) at 8–9; Zurich Ans. (DE # 34) at 3.) Westfield and Zurich move for

reimbursement of these costs as of the date Penn National's and Selective's duty to defend

Weaver Cooke as an additional insured was triggered, thereby giving Penn National and

Selective the "primary responsibility of defending Weaver Cooke for the remainder of the

Underlying Action[.]" (Westfield & Zurich Mem. Supp. Summ. J. (DE # 71) at 2.) As such,

Westfield and Zurich have sufficiently alleged facts in their pleadings sufficient to confer

standing upon each of them. <u>See</u> <u>Steadfast Ins. Co.</u>, 217 F. Supp. 3d at 911 (finding standing for

an insurance company who, although not a party to the underlying contract, was "intimately

intertwined with the priority of all parties' coverage obligations").

**B.      Duty to Defend**

Under North Carolina law, interpretation of an insurance policy, including the extent of the insurer's duty to defend, is a question of law.  See Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co., 340 S.E.2d 374, 377 (N.C. 1986) ("[The duty to defend] is an appropriate subject for summary judgment.").  Broader than the duty to insure, "[t]he duty to defend is generally determined by analyzing the pleadings in the underlying lawsuit." Westfield Ins. Co. v. Nautilus Ins. Co., 154 F. Supp. 3d 259, 264 (M.D.N.C. 2016) (citing Waste Mgmt. of Carolinas, Inc., 315 S.E.2d at 377).  As such, the courts employ the comparison test, where "the pleadings are read side–by–side with the policy to determine whether the events as alleged are covered or excluded." Waste Mgmt. of Carolinas, Inc., 315 S.E.2d at 378.  "Allegations of facts that describe a hybrid of covered and excluded events or pleadings that disclose a mere possibility that the insured is liable . . . suffice to impose a duty to defend.  Thus, an insurer must defend its insured against a lawsuit unless no allegation is "even arguably covered by the policy." Cont'l Cas. Co. v. Amerisure Ins. Co., 886 F.3d 366, 371 (4th Cir. 2018) (internal quotation marks and citations omitted).  Additionally, "facts learned from the insured and facts discoverable by reasonable investigation may also be considered." Waste Mgmt. of Carolinas, Inc., 315 S.E.2d at 378 (citation and quotation marked omitted) (finding plaintiff's affidavits relevant to determining the defendant's duty to defend).  "[A]ny doubt as to coverage must be resolved in favor of the insured." Duke Univ. v. St. Paul Fire & Marine Ins. Co., 386 S.E.2d 762, 763–64 (N.C. 1990) (citing Waste Mgmt. of Carolinas, Inc., 315 S.E.2d at 377).

**1.      Additional Insured, Property Damage, and Occurrence**

The parties disagree whether Selective and Penn National owe a duty to defend Weaver Cooke as an additional insured.  Weaver Cooke, Westfield, and Zurich contend that "Penn

National and Selective must provide a defense so long as it might be possible for [p]laintiff in the Underlying Action to establish property damage caused by conduct for which Weaver Cooke is legally responsible." (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 13; see also Westfield & Zurich Mem. Supp. Summ. J. (DE # 71) at 3.) In response, Selective contends "Weaver Cooke was sued by [New Bern] for purely economic loss type damages[,]" not property damage. (Selective Resp. Opp'n (DE # 91) at 2; see also Selective Resp. Opp'n (DE # 90) at 6; Selective Mem. Supp. Summ. J. (DE # 80) at 5.) Similarly, Penn National contends there is no basis for "[Weaver Cooke's] contention that [ECM's] work was responsible for 'property damage' as defined within the applicable Penn National policy[,]" resulting from its work on brick veneer installation. (Penn National Resp. Opp'n (DE # 84) at 10; see also Penn National Resp. Opp'n (DE # 88) at 5.)

Under Section I of Penn National's and Selective's policies—coverage provided for bodily injury and property damage—Selective and Penn National both agree to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damages' to which this insurance applies." (Selective Policy Excerpts (DE # 71–26) Ex. 23 at 10; Penn National Policy Excerpts (DE # 71–25) Ex. 22 at 13.) They also have a "duty to defend the insured against any 'suit' seeking those damages." (Selective Policy Excerpts (DE # 71–26) Ex. 23 at 10; Penn National Policy Excerpts (DE # 71–25) Ex. 22 at 13.) Under section IV—definitions—the policies identically define property damage. Property damage is defined as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

(Selective Policy Excerpts (DE # 71–26) Ex. 23 at 25; Penn National Policy Excerpts (DE #71–25) Ex. 22 at 27.)  However, coverage for property damage is only obligated when there has been a triggering event or "occurrence"—"This insurance applies to bodily injury and property damage only if: (1) The bodily injury or property damage is caused by an occurrence that takes place in the coverage territory [.]"  (Selective Policy Excerpts (DE # 71–26) Ex. 23 at 10; Penn National Policy Excerpts (DE # 71–25) Ex. 22 at 13) (internal quotation marks omitted).)  The policies identically define occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (Selective Policy Excerpts (DE # 71–26) Ex. 23 at 24; Penn National Policy Excerpts (DE #71–25) Ex. 22 at 26.)

In addition to the original contracting party, the insured, coverage also extends to "additional insureds."  Under the policy amendments to Section II under Penn National's policy —who is an insured—additional insured's include:

> [a]ny person(s) or organization(s) (referred to below as additional insured) with whom you are required in a written contract or agreement to name as an additional insured for the products–completed operations hazard, but only with respect to liability for bodily injury or property damages caused, in whole or in part, by your work performed for that additional insured. . . .

(Penn National Policy Excerpts (DE # 71–29) Ex. 26 at 4 (internal quotation marks omitted).) Similarly, under an endorsement to Section II under Selective's policy—who is an insured— an insured:

> [i]s amended to include as an additional insured any person or organization when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy.  Such person or organization is an additional insured only with respect to liability for bodily injury or property damage caused, in whole or in part, by your work performed for that additional insured and included in the "products–completed operations hazard."

(Selective Policy Excerpts (DE # 71–30) Ex. 27 at 6 (internal quotation marks omitted).)  The

policies similarly define the products–completed operations hazard as "all. . . 'property damage'

occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"

(Selective Policy Excerpts (DE # 71–26) Ex. 23 at 24; Penn National Policy Excerpts (DE #71–

25) Ex. 22 at 26.)

As for the pertinent pleadings, New Bern filed three complaints.  In its initial complaint,

filed 30 March 2009, it contends Weaver Cooke breached the construction contract and as a

"proximate result" caused damage in the form of the cost to complete the work and correct

deficiencies in the work as well as caused damage to vehicles and other property.  (New Bern

Compl. (DE # 80–1) ¶ 174.)  On 6 May 2010, New Bern amended its complaint repeating these

allegations and adding allegations against Weaver Cooke regarding, among other things, water

intrusion causing damages (and potential mold problems) to residential units and common areas.

(See New Bern Am. Compl. (DE # 71–8) Ex. 5 at 25–27.)  Finally, on 8 June 2012, New Bern

filed a supplemental complaint, incorporating by reference the allegations in its amended

complaint and attaching and incorporating a "Catalog of Issues" identified by its expert engineer,

George Barbour ("Barbour").  (See New Bern Supp. Compl. (DE # 71–9) Ex. 6 at 7–8.)  That

document provides, in relevant part,

| Issue No. | Description of Issue | Consequence | Corrective Actions |
|---|---|---|---|
| 1 | **Building Envelope** | | |
| 1.1<br><br>[section 1.2–1.4 omitted] | Weather resistive barrier and related flashing installation | Water intrusion into residential units and corridors. Lack of an effective air barrier. | Remove cladding as required to address WRB installation defects |
| 1.5 | Damage | Examples of water damage, efflorescence, water seepage and other damages caused by construction defects. | Remove and re[p]lace water damaged components after addressing sources of water intrusion |

| | | Water damaged interior finishes. Corroded studs. | |
|---|---|---|---|
| 1.6 | Roof parapet, roof membrane and flashing installation and performance | Water intrusion into many residential units at the fourth floor | Remove and replace the parapet roofing and coping in accordance with the contract documents |
| 1.7 | Brick Veneer | Potential for cracking at areas of unsupported brick at discontinuous brick floor line shelf angles[1] | Install s[h]elf angles with mitered and welded intersections at building corners where omitted during construction. Provide integrated flashing, sealants and expansion material as specified. |
| [sections omitted] | | | |
| **4** | **Mechanical, Electrical, Plumbing and Fire Protection** | | |
| 4.4 | Waste plumbing deficiencies | Noticeable drain noises caused by use of plumbing fixtures in residential units above. Backup of raw sewage in residential mechanical closets. | The cause of this sewer discharge should be investigated and corrected as required by code. The damages to interior finishes should also be repaired.[2] All of the hub drains and condensate drains should be inspected and deficiencies corrected. |

(Id.)

ECM's subcontract for the project, set forth the extent and limits of its work:

Work includes furnishing and installing brick, concrete masonry units, cavity insulation, joint reinforcing, wall ties, grout, thru–wall flashing, pre–formed control joints, dove tail anchors, mortar stop, damp[]proofing, clean up, mortar, sand, supervision, labor, equipment, and taxes.

. . . .

---

[1] "[] The resulting discontinuous nature of the Tyvek as discussed in section 1.1–Weather Resistive Barrier and Related Flashings" was recognized as an issue related to brick veneer construction defects. (Barbour Inspection Report (DE # 71–16) Ex. 13 at 8.)

[2] "Waste discharge occurred in many of the first floor units in building section A resulting in damage to interior finishes including sheetrock and hardwood flooring[.]" (Barbour Inspection Report (DE # 71–16) Ex. 13 at 21.)

Work excludes layout, steel lintels, pre–cast materials, setting of window and door frames, dove–tail anchor slots, caulking and sealants, rebar, shoring and bracing, brick pavers, fire stops, wall tie installation, water proofing, water repellants, roof flashing, testing, welding, and removal of trash from site.

(ECM Subcontract (DE # 71–21) Ex. 18 at 4; ECM Interrog. Resp. (DE # 71–14) Ex. 11 at 5.) In its subcontract for the project, DD Plumbing was responsible for installing various un–insulated piping and plumbing fixtures, such as kitchen faucets, bathroom faucets, and tub faucets. (See DD Plumbing Subcontract (DE # 71–22) Ex. 19 at 4.)

Assuming these facts to be true, the pleading implicate ECM's and DD Plumbing's work and that work damaged property unrelated to the subject of the Subcontracts. Allegedly, their defective work resulted, at least in part, in water intrusion and/or waste discharge which damaged interior finishes. Such damages would not have been anticipated or expected from ECM's or DD Plumbing's work. As such, the events New Bern alleged against Weaver Cooke constitute an occurrence and property damage under Selective and Pen National's policy provisions, thereby triggering the insurers' duty to defend Weaver Cooke as an additional insured.

Selective and Penn National seek to avoid this result by relying on Westfield Ins. Co. v. Nautilus Ins. Co., 154 F. Supp. 3d 259 (M.D.N.C. 2016). In Nautilus, a general contractor procured a contract with the Guilford County Board of Education, and then sub-contracted part of the job to Associated Steel. 154 F. Supp. 3d at 262. During the construction, a rain event caused damage to the project. Id. The general contractor contracted with another corporation, Afterdisaster, to remediate the damage. Id. Afterdisaster filed suit in state court against the general contractor for the payment of the contract fees for the work performed. Id. Ultimately, a federal declaratory judgment action was brought to determine whether Associated Steel's insurance company had a duty to defend the general contractor in the state court action. Id. at

263.  The district court found that Associated Steel's insurance company did not have a duty to defend because the "occurrence" was the general contractor's failure to pay for the services rendered by Afterdisaster.  See id. at 267.  Because contractual damages are not property damages, the insurer did not have a duty to defend in the state suit.  Id.  Specifically,

> though the contract between Afterdisaster and [the general contractor] can be traced to the property damage caused by the rain event, [the general contractor's] subsequent breach of contract represents a separate and independent act severing the casual connection with the water intrusion event. . . . [T]he events giving rise to [the general contractor's] liability to Afterdisaster came after the rain event. . . . Such an indirect connection between Afterdisaster's claims and the rain event is insufficient to trigger [the insurer's] duty to defend. To find that Afterdisaster was seeking damages because of property damage would distort the meaning of this provision and extend its reach so as to provide coverage for any liability where property is a tangential factor.

Id. at 271 (internal citations and quotation marks omitted).

Nautilus is distinguishable from this action.  While the triggering event for the lawsuit in Nautilus was the failure to pay for the services rendered by Afterdisaster, here, the underlying action is a result of property damages, due to poor or incomplete craftsmanship at the project.  Based on the pleadings above, there are allegations of damage to previously undamaged property as a result of work allegedly performed by ECM and DD Plumbing under their subcontracts.  Specifically, property that was previously undamaged, such as the sheetrock on the first floor, allegedly became damaged as a result of DD Plumbing's poor installation of plumbing.  The defective plumbing installation was unrelated to the craftsmanship of the sheetrock, and accordingly, damage caused by that work to the sheetrock fits under the definition of property damage covered under the policies.  See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Intercoastal Diving, Inc., No. 7:10–CV–115–FL, 2012 WL 1978291, *4–5 (E.D.N.C. June 1, 2012) (internal quotation marks and citation omitted) ("The term property damage in an insurance policy has been interpreted to mean damage to property that was previously

undamaged, and not the expense of repairing property or completing a project that was not done correctly or according to contract in the first instance."). Similarly ECM's allegedly defective brick veneer work caused water damage to residential units at the project. Based upon New Bern's factual allegations, and what was discoverable through reasonable investigation, both Selective and Penn National have a duty to defend Weaver Cooke in the Underlying Action.

## 2. Tender Letters

The parties also dispute if, and when, Selective and Penn National received official tenders for Weaver Cooke's defense. "An insurer's duty to defend is triggered when insurer first receives notice of [a] lawsuit and not when [the] complaint is filed." <u>Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.</u>, 90 F. Supp. 3d 526, 552 (E.D.N.C. 2015) (internal citation and quotation marks omitted) (finding that a letter from one insurance company to another sufficient for actual notice). It is undisputed that Selective and Penn National received the Second Tender Letter dated 12 September 2013, (<u>see</u> Westfield & Zurich Mem. Supp. Summ. J. (DE # 71) at 10; Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 3; Selective Mem. Supp. Summ. J. (DE # 80) at 6, 11; Penn National Statement of Material Facts (DE # 89) ¶¶ 10, 12–13 (stating that Penn National does not dispute receipt of the letter, but was unable to locate the letter in its files)), however, Selective disputes the significance of the letter. The letter states, in relevant part,

> I am writing on behalf of Westfield Insurance Company ("Westfield["])[] with regard to the above–referenced matter which arises out of the construction of a project known as SkySail Luxury Condominiums in New Bern, North Carolina. The owner of the project has filed a lawsuit against Weave Cooke Construction, LLC ("Weaver Cooke"), alleging that it has incurred damages as a result of certain construction defects at the Project. Westfield is currently defending Weaver Cooke in this lawsuit.
>
> Pursuant to a subcontract agreement entered into between Weaver Cooke and your insured, your insured agreed to perform certain scopes of work at the project. The subcontract agreement expressly requires Weaver Cooke to be named as an additional insured under your policy on a primary and non–contributing basis.

> Since the damages alleged by the plaintiff in this matter allegedly result from scopes of work performed by your insured, Westfield hereby tenders this matter to you for defense and indemnity pursuant to the term of the subcontract agreement.
>
> For your reference, I have enclosed herein a copy of the plaintiff's Amended Complaint and First Supplemental Complaint, the subcontract agreement, and the Other Insurance provision contained in Westfield's policies.
>
> Please acknowledge this tender in writing within 14 days of the date of the same, confirming your agreement to indemnify and defend Weaver Cooke in this matter. Please provide me with a complete copy of your insured's policy.

(Selective App'x (DE # 80–4) Ex. D at 1; Penn National Req. for Admis. and Am. Answers (DE # 71–23) Ex. 20 at 85.) Selective contends Weaver Cooke, not Westfield, needed to provide notice of the Underlying Action. This argument is unavailing. It is insignificant that the Second Tender Letter was sent by Westfield as opposed to Weaver Cooke. The letter provided actual notice, as demonstrated by specific reference to the lawsuit, the failed project, and the additional insured provision. See Kubit v. MAG Mut. Ins. Co., 708 S.E.2d 138, 154 (N.C. Ct. App. 2011) ("[I]n North Carolina, the duty to defend arises when an insurer receives actual notice of the underlying action."). Further, Selective opened a coverage file either by the end of September or October 2013, (see Selective App'x (DE # 78–2) Ex. 1.1 at 91–92), indicating it understood this letter to be actual notice. As such, the latest date Selective and Penn National would have received actual notice of Weaver Cooke's claim around September 2013.[3] (See Westfield & Zurich Resp. Opp'n (DE # 86) at 4.) It is on that date, at a minimum, Selective and Penn National had a duty to defend Weaver Cooke as an additional insured.

### 3. Primary Insurer

Multiple parties seek damages as a result of Selective's and Penn National's failure to defend Weaver Cooke in the Underlying Action. First, Westfield and Zurich contend that "[a]

---

[3] Selective received the Second Tender letter by 22 September 2013. (Selective App'x (DE # 78–2) Ex. 1.1 at 18 (discussing Beverly Johns email confirming receipt of the letter).)

material term in both the ECM and [DD] Plumbing subcontracts required them to name Weaver Cooke as an additional insured under their respective commercial general liability insurance policies on a primary and non–contributory basis relative to any insurance policies issued directly to Weaver Cooke as a named insured." (Westfield & Zurich Mem. Supp. Summ. J. (DE # 71) at 8.) Based on their representation of Weaver Cooke under a reservation of rights in the Underlying Action, over the past five years, Westfield maintains it has incurred a total of $836,942.82 and Zurich maintains it has incurred $1,087,459.23. (Id. at 10.) Both parties request a declaration that Selective and Penn National reimburse them for all "costs fees, and other expenses they have incurred in defending Weaver Cooke in the Underlying Action from at least September of 2013 through the date that the Court enters its order." (Id. at 26.)

Weaver Cooke alleges that although Westfield and Zurich have undertaken Weaver Cooke's defense in the Underlying Action, it "has been forced to pay the remainder of its defense costs itself." (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 11, citing Weaver Cooke Ans. (DE # 24) ¶ 12.) Weaver Cooke does not provide a specific number totaling its costs and instead requests "judgement for recovery of all of the defense costs that [it] has been required to pay out of its own pocket[.]" (Id. at 12.) Specifically, Weaver Cooke contends Selective's and Penn National's policies provide primary coverage and therefore are "jointly responsible to Weaver Cooke for all its defense costs. . . ." (Weaver Cooke Reply (DE # 100) at 3 & n.1.)

Neither Selective nor Penn National dispute the contention that if it is determined they have a duty to defend, their respective policies are primary. Rather, Selective and Penn National suggest that they should pay nothing because Westfield and Zurich have defended Weaver Cooke in the Underlying Action and Weaver Cooke chose to pay its selected attorney at a higher

rate than Westfield and Zurich wanted to pay. (<u>See</u> Penn National Resp. Opp'n. (DE # 88) at 8–9; Selective Mem. Supp. Summ. J. (DE # 80) at 11; Selective Resp. Opp'n. (DE # 90) at 5.)

Both Penn National's and Selective's additional insured provisions acknowledge that their insurance is primary and non–contributory if required by contract. (<u>See</u> Penn National Policy Excerpts (DE # 71–29) Ex. 26 at 4) ("If a written contract or agreement that requires any person(s) or organizations(s) to be an additional insured also requires this insurance to be primary and noncontributory, then this insurance is primary over any other insurance in which the additional insured is a Named Insured."); (Selective Policy Excerpts (DE # 71–30) Ex. 27 at 6) ("This coverage shall be excess with respect to the person or organization included as an additional insured by its provisions; any other insurance that person or organization has shall be primary with respect to this insurance, unless this coverage is required to be primary and not contributory in the contract or agreement referred to above [i.e., the contract that provides the person or organization be an additional insured]."). As recognized above, the Subcontracts require the additional insured's insurance to be primary and on a non–contributory basis. Accordingly, under the respective policies and Subcontracts, Selective and Penn National are primary, non–contributory insurers.

Selective's arguments to the contrary are unavailing because they ignore the scope of the duty to defend. When an insured provides notice to an insurer of a claim, the broad nature of the duty to defend provides the insurer the opportunity to mount its defense early to control defense costs. <u>See</u> <u>Westfield Ins. Co.</u>, 154 F. Supp. 3d at 265; <u>Wm. C. Vick Const. Co. v. Pennsylvania Nat. Mut. Cas. Ins. Co.</u>, 52 F. Supp. 2d 569, 596 (E.D.N.C. 1999), <u>aff'd sub nom.</u> <u>Wm. C. Vick Const. Co. v. Great Am. Ins. Co.</u>, 213 F.3d 634 (4th Cir. 2000). As a result, when an insured fails to provide notice, or provides late notice to an insurer, the insurer is not required to pay for

legal fees prior to its notice of the claim.  <u>Wm. C. Vick Const. Co.</u>, 52 F. Supp. 2d at 596.  This

protects the insurer from being required to "pay for [] defense costs which it had no opportunity

to control."  <u>Id.</u>

Here, however, Selective and Penn National had notice on or around 12 September 2013

of Weaver Cooke's claims, and at that time, had the right to control the defense.  Selective's and

Penn National's failure to do so does not entitle them to claim that the incurred defense costs are

at the insured's, or excess insurer's, peril.  Such a result would encourage insurers to rebuke their

duty to defend.  Similarly, if a primary insurer has a duty to defend without contribution but fails

to defend, an excess insurer who defends the action, absent their own primary duty to defend, is

entitled to reimbursement of those defense fees and costs.  <u>See</u> <u>Cont'l Cas. Co. v. Amerisure Ins.</u>

<u>Co.</u>, 886 F.3d 366, 375 (4th Cir. 2018).  Based on the foregoing, Weaver Cooke's, Westfield's,

and Zurich's motions will be granted on the issue of the Selective's and Penn National's duty to

defend Weaver Cooke in the Underlying Action.

**C.      North Carolina Claims**

Weaver Cooke and Selective also move for judgment on Weaver Cooke's claims

pursuant to the IUTPA and UDTPA against Selective and Penn National.  (Weaver Cooke Mem.

Supp. Summ. J. (DE # 76) at 13–14; Selective Mem. Supp. Summ. J. (DE # 80) at 21–26.)  The

three provisions of the IUTPA at issue provide:[4]

> (11) Unfair Claim Settlement Practices.--Committing or performing with such
> frequency as to indicate a general business practice of any of the following:

---

[4] In its summary judgment brief, Weaver Cooke initially cites to § 58–63–15(11) (b), (d), (e), and (n), (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 1), then quotes from (b), (e), (g), and (n), (<u>id.</u> at 16–17), and finally analyzes the facts of the case as to subsections (b), (e), and (n), (<u>id.</u> at 17–18).  In its summary judgment brief, Selective refers to Weaver Cooke's crossclaims under § 58–63–15(11) (b), (c), (e), and (n).  (Selective Mem. Supp. Summ. J. (DE # 80) at 26.)  Although Weaver Cooke arguably pled a violation of (c) in its crossclaim, (<u>see</u> Weaver Cooke Ans. (DE # 24) at 10–11), Selective does not discuss any facts or law to support summary judgment on such a claim, (Selective Mem. Supp. Summ. J. (DE # 80) at 31–32).  Accordingly, the court only addresses claims based on violations of (b), (e), and (n).

Provided, however, that no violation of this subsection shall of itself create any cause of action in favor of any person other than the Commissioner. . .

b. Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

. . .

e. Failing to affirm or deny coverage of claims within a reasonable time after proof–of–loss statements have been completed;

. . .

n. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

N.C. Gen. Stat. § 58–63–15. "In North Carolina, a violation of section 58–63–15(11)[] of the IUTPA constitutes an unfair or deceptive trade practice under the UDTPA [§ 75–1.1]—as a matter of law." <u>ABT Bldg. Prod. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, 472 F.3d 99, 123 (4th Cir. 2006).

## 1.    Selective

In its motion for summary judgment, Weaver Cooke claims Selective's behavior, specifically its failure to timely act in various ways in response to its additional insured claim, resulted in violations of the IUTPA. Because of the delay, Weaver Cooke claims it had to fund part of its own defense. (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 12.) Selective disputes that it in any way delayed its response to Weaver Cooke or that Weaver Cooke suffered damages given that Westfield and Zurich are defending it in the Underlying Action. In its own motion for summary judgment, Selective contends "[t]he entire basis for Weaver Cooke's Claims Practices violation is found in two letters." (Selective Mem. Supp. Summ. J. (DE # 80) at 21.) Selective contends that it did not receive the First Tender Letter, the Second Tender was insufficient, it acted reasonably, and Weaver Cooke has not been damaged. (<u>Id.</u> at 22–33.)

      i.      **Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies**

Weaver Cooke contends Selective's failure to timely respond to either tender letter resulted in violation of § 58–63–15(11)(b).  (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 17.)  An insurer violates that portion of the IUTPA by failing to acknowledge and act reasonably promptly upon communications, such as inquiries or tender letters, regarding an insured's claim.  See Guessford v. Pennsylvania Nat. Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 661 (M.D.N.C. 2013).  Selective contends, without citation to authority, that the statute "is not applicable because no *insured* made a claim to Selective."  (Selective Resp. Opp'n (DE #90) at 8) (emphasis added); see also Selective Mem. Supp. Summ. J. (DE # 80) at 31.)  This is an overly strict reading of the statute.  By its plain language, § 58–63–15(11)(b) applies to insurances claims.  Although a third–party, i.e., one who is neither an insured nor in privity with an insurer cannot maintain a cause of action under § 58–63–15(11)(b) and § 75–1.1 against an adverse party's insurer, see Lee v. Mut. Cmty. Sav. Bank, SSB, 525 S.E.2d 854, 856 (N.C. Ct. App. 2000), nothing in § 58–63–15(11)(b) restricts its application to insurances claims communicated directly from an insured.  Therefore, that Westfield, as opposed to Weaver Cooke, notified Selective of the claim is irrelevant.

As to whether Selective failed to acknowledge and act reasonably promptly depends on the actions it took upon communications with respect to the additional insured claim for Weaver Cooke.  Selective opened a claim investigation as to Weaver Cooke's additional insured status upon receipt of the Second Tender Letter.  To that end, Selective arguably acted reasonably promptly in response to the Second Tender Letter.  (See Selective App'x (DE # 78–2) Ex. 1.1 at 91–92.)  However, there is a factual dispute as to whether Selective received the First Tender Letter (the letter Weaver Cooke authored itself).  If it did, Selective would have failed to

acknowledge Weaver Cooke's additional insured claim at least until it opened the coverage file in September or October 2013, well over a year after the First Tender Letter, without explanation. With an unknown date of initial tender, the court is unable to determine when Selective acted "upon communications with respect to claims arising under insurance policies." Accordingly, on the facts presented, Weaver Cooke's and Selective's motions for summary judgment on Weaver Cooke's UDTPA claim based on a violation of § 58–63–15(11)(b) will be denied.

ii.    **Failing to affirm or deny coverage of claims within a reasonable time after proof–of–loss statements have been completed**

Weaver Cooke contends that Selective did not deny its claim until at least a year after the Second Tender Letter was received in violation of § 58–63–15(11)(e). (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 17–18.) Selective contends its filing of a declaratory judgment action against DD Plumbing, Weaver Cooke, and New Bern on 12 June 2014 was its timely denial of Weaver Cooke's claim only nine months after its receipt of the Second Tender Letter. (Selective Mem. Supp. Summ. J. (DE # 80) at 6–7, 32; Selective Resp. Opp'n (DE # 90) at 3); (see also Selective App'x (DE # 78–2) Ex. 1.1 at 10–11 ("There is no discreet letter responding to the tender for defense costs by Westfield. . . . And there are circumstances where we have not responded to a tender for defense with a coverage position – coverage determination letter, and we started a [declaratory judgment] action.").) Whether Selective's actions constitute a denial of coverage within a reasonable time is an issue of fact. See N.C. Gen. Stat. § 58–63–15(11)(e) (failing to define "a reasonable time"); Cf. Laschkewitsch v. Legal & Gen. Am., Inc., 247 F. Supp. 3d 710, 720 (E.D.N.C. 2017) (finding six weeks to be "a reasonable time" to deny a claim under § 58–63–15(e)), aff'd, 725 F. App'x 252 (4th Cir. 2018).

Selective also contends "Section (e) is not applicable because no insured made a claim and no proof of loss statements have been submitted." (Selective Resp. Opp'n (DE # 90) at 8.) Neither argument is persuasive. First, subsection (e), like the other subsections, does not specify the manner in which the insurance claim has to be communicated. Second, the statute does not define what constitutes a proof of loss statement. The record also does not reflect any Selective policy provision on proof of loss. In fact, in reviewing the Selective policies provided, the court is unable to find a single provision in a Selective policy that requires a proof of loss statement or instructs an insured how to submit a proof of loss statement. Additionally, neither party has provided briefing or argument, aside from the singular comment above, on the proper presentation of proof of loss. Weaver Cooke's and Selective's motions for summary judgment on Weaver Cooke's UDTPA claim based on a violation of § 58–63–15(11)(e) will be denied.

### iii. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement

Weaver Cooke contends that Selective failed to provide it a reasonable explanation of the basis of Selective's denial of the claim in its answer to Weaver Cooke's counterclaim in the declaratory judgment action in violation of § 58–63–15(11)(n). (Weaver Cooke Mem. Supp. Summ. J. (DE # 76) at 18.) In response, Selective contends

> Section (n) fails because Weaver Cooke never made a request to Selective; Selective engaged in frequent communications with Weaver Cooke defense counsel; Selective provided a full defense for all plumbing claims; and Selective filed a declaratory judgment action because no damages asserted in the underlying action included a claim that met the definitions of occurrence, property damage or policy period.

(Selective Resp. Opp'n (DE # 90) at 9.)

Selective's arguments are unavailing. The subsection at issue does not contain that requirement that the insured itself submit the claim. Furthermore, as to any communications

Selective may have had with Weaver Cooke's defense counsel and the contents thereof, Selective has not cited to evidence on the record. Also, Selective's defense on behalf of DD Plumbing does not negate its responsibilities as to any other insured. Finally, whether Selective's filing and the timing thereof in the declaratory judgment action promptly provided a reasonable explanation of the basis of its denial of Weaver Cooke's claim is an issue of fact to be determined at trial. Therefore, Weaver Cooke's and Selective's motions for summary judgment on Weaver Cooke's UDTPA claim based on a violation of § 58–63–15(11)(n) will be denied.

### iv. Damages

Selective also contends it is entitled to summary judgment on Weaver Cooke's UDTPA claims based on the lack of damages. (Selective Mem. Supp. Summ. J. (DE # 80) at 10–11, 25.) Selective argues that Weaver Cooke suffered no harm because it is receiving a defense from Zurich and Westfield in the Underlying Action. (Id. at 25.) However, as recognized above, the fact that Weaver Cooke funded, in part, its own defense does not relieve Selective of liability for damages nor does the fact that Zurich and Westfield have provided Weaver Cooke with a defense. Weaver Cooke has demonstrated damages relating to its UDTPA claims.

### 2. Penn National

As for its UDTPA claim against Penn National based on violations of the IUTPA, Weaver Cooke contends,

> Penn National did not respond to the tenders for at least three years and four months after it received the first (Weaver Cooke) tender. The delay could have been longer but, as discussed, Penn National acknowledges that it received the Weaver Cooke tender no later than November of 2012 and did not respond to Weaver Cooke's crossclaim until March, 2016.

(Weaver Cooke Mot. Supp. Summ. J. (DE # 76) at 17.) In response, Penn National offers the following:

The identification of potential "trigger dates" for coverage under its policy as testified to by 30(b)(6) designee Gary Johnson shows the extent to which Penn National reviewed information it had received to formulate its decision to deny coverage as an additional insured to Weaver Cooke. Although Penn National admits that it would have preferred to have located letters in its file showing a formal written response, there is no indication that Weaver Cooke ever understood it would be an additional insured under Penn National's policy or that Penn National in some way communicated that its decision was to provide additional insured status to Weaver Cooke. Throughout Penn National's investigation and ultimate determination that Weaver Cooke did not enjoy additional insured status, Weaver Cooke was being represented by counsel and was in no way prejudiced by any failure on the part of Penn National to provide a formal written response to Weaver Cooke's tender if such was the case. There is no evidence that Weaver Cooke was harmed in any way by any alleged delay in responding to its tender.

(Penn National Resp. Opp'n (DE # 88) at 7–8.)

In reviewing the portion of Gary Johnson's ("Johnson") testimony and other documents attached to Penn National's response, it is evident that Penn National did have internal communications regarding Weaver Cooke as an additional insured and that the claim should be denied. (See Johnson Dep. (DE # 71–7) Ex. 4 at 12–41 (claim notes); Penn National Resp. Opp'n (DE # 88–3) Ex. C at 3–14) (claim notes).) The timing of the investigation, what materials were reviewed, and what independent investigation, if any, actually took place are glaringly absent from the sporadic claim file notes provided. Johnson's testimony does not shed any more light on the matter. Through Johnson, Penn National admitted that the First Tender Letter was in its files, but it could not confirm the date of receipt of the letter, (see Johnson Dep. (DE # 71–7) Ex. 4 at 8), and that it is likely but not certain whether Penn National's employee Gregg Gross spoke with different parties at mediation in the Underlying Action in November 2013 regarding Penn National's position on Weaver Cooke's status, (id. at 10; Penn National Resp. Opp'n (DE # 89–2) Ex. B at 3). Penn National was unable to provide the specific date when it concluded there was not additional insured coverage to be afforded for Weaver Cooke, but stated it was early on in the claim process, likely in July 2012. (Johnson Dep. (DE # 71–7)

Ex. 4 at 7.)  Further, it was unable to answer whether it responded to the Second Tender Letter, which it confirmed it received, (id. at 9–10.)

On the undisputed factual record, Penn National failed to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim, in violation of § 58–63–15(11)(n), and failed to affirm or deny coverage of claims within a reasonable time in violation of § 58–63–15(11)(e).

Like Selective's argument, the court rejects Penn National's argument that Weaver Cooke suffered no harm.  However, it is unclear if Penn National has failed to meet the standard under § 58–63–15(11)(b) because there is a factual dispute as to when Penn National acknowledged and acted upon Weaver Cooke's claims.  Penn National did show that it did act upon them, but the timeline, scope, and materials reviewed is unknown.  Therefore, Weaver Cooke's motion for summary judgment on its UDTPA claims based on violations of § 58–63–15(11)(e) and (n) will be granted, and its UDTPA claim based on violation of § 58–63–15(11)(b) will be denied.

## IV.    CONCLUSION

For the aforementioned reasons, the court DENIES Selective's motion for summary judgment (DE # 72).  The court GRANTS Westfield and Zurich's motion for summary judgment (DE # 67).  The court GRANTS Weaver Cooke's motion for summary judgment on the issue of Selective's and Penn National's duty to defend and Penn National's violations of § 58–63–15(11)(e) and (n) (DE # 74); otherwise, the motion is DENIED.  The issue of damages regarding the duty to defend and liability and damages on the remaining unfair trade practices claims are STAYED until the Underlying Action is resolved.  (See DE # 55.)   Upon conclusion of the

Underlying Action, a party may file a motion to dissolve the stay. The clerk is DIRECTED to administratively close this case.

This 11 April 2019.

_____
W. Earl Britt
Senior U.S. District Judge